644 P.2d 323

L. Junior WHITE and Levora White,
Plaintiffs-Appellants,

v.

Vernon REHN, Karen Rehn, William
Rehn and June Rehn,
Defendants-Respondents.

No. 13416.

Supreme Court of Idaho.

April 15, 1982.

Lowell N. Hawkes and Dalon Esplin of Lowell N. Hawkes, Chartered, Pocatello, for plaintiffs-appellants.

Thomas H. Church and Steven A. Tuft of Church, Church, Snow & Tuft, Burley, for defendants-respondents.

McFADDEN, Justice.

This action involves some 960 acres of a 9,000 acre dry farm in Cassia County. The 9,000 acres were, until 1975; owned by Conrad and Anna Rehn. Their son, Vernon Rehn, leased the acreage from them and ran the farm. The lease gave him a right of first refusal to purchase the land if Conrad and Anna decided to sell. In February 1975 Conrad Rehn died. Vernon Rehn wanted to purchase the farm from the estate and his mother. Both parties were amenable to the sale. The executors petitioned the court to authorize the sale and this petition was granted; Vernon also apparently obtained his mother's verbal consent. All arrangements had been made and the contract drafted by March of 1976.

Vernon Rehn did not, however, have the necessary $211,000 down payment. Vernon consulted with Robert Hilliard of Idaho Bank & Trust Company and they decided that Vernon should sell 960 of the 9,000 acres in order to come up with the down payment. Both anticipated a cash sale, purportedly due to the estate's need for cash to pay administrative costs and taxes.

Hilliard subsequently contacted Warren King, an agent for Sierra West Real Estate of Logan, Utah. King visited Vernon Rehn and Rehn drove King around the 960 acre parcel. King then contacted Hilliard who told him the terms of the sale. King contacted L. Junior White upon returning to Logan; White expressed an interest in the property. King took White to view the property, at which time he showed the perimeters of the parcel as Vernon Rehn had described them to him, and told White that the purchase price was approximately $243 an acre, cash. White told King to set up an appointment to work out the terms of purchase.

On March 30, 1976, Junior White, LaVora White and two agents from Sierra West, David Nielson and Warren King, drove up from Utah and viewed the property. They checked the dimensions using an automobile odometer. White told King that if the property could be irrigated, he would buy it.[1] They then drove to the Ramada Inn in Burley, where they met with Hilliard and together they filled out an "Earnest Money Receipt and Offer to Purchase" form. The earnest money receipt called for payment of the entire purchase price in exchange for a deed to the property. No land sale contract was contemplated. White stated that the purchase had to be conditioned on obtaining well permits and financing. The well permits condition was written into the agreement, but the financing condition was not. They agreed on a closing date of July 1, 1976, in order to give White time to obtain financing. This was written into the agreement. White gave Nielson a check for $5,000 and Hilliard took the offer to Vernon and Karen Rehn. The Rehns wanted the price increased by $20,000 to cover the value of crops growing on the land. After some negotiations, the Rehns and Whites agreed, on April 1, 1976, to a $12,000 increase to cover crops. Hilliard, who had the earnest money agreement, added the $12,000 to it and had the Rehns initial it. He kept one copy for the Rehns and returned the rest to King. At this point King added a "subject to financing" term and signed the agreement on behalf of the Whites. Junior White began looking for financing and claimed to have obtained commitments for financing within a short time after the earnest money agreement was signed by the Rehns. White also arranged to have Vernon Rehn accompany him to the office of the Department of Water Resources in Burley to obtain well permits. On April 9, the Whites drove to the Rehns' farm, viewed and discussed the property with the Rehns, then drove to the Department of Water Resources where Vernon Rehn used his own maps to spot well locations.

On April 12 Vernon Rehn called the Whites and told them he could not sell them the 960 acres. His mother refused to sell this acreage to him, apparently because William Rehn (Vernon's brother) now wanted to purchase the property. White went ahead with financing and obtained a commitment. On May 12 White instructed King to close the transaction. On May 14 William and June Rehn purchased 937 of the 960 acres. On the same date the remainder of the 9,000 acres was sold to Vernon Rehn. The Whites subsequently filed a complaint seeking specific performance or damages. The complaint also sought relief against William and June Rehn for interference with contract.[2] Respondents filed an answer in which they counterclaimed for attorney fees. After depositions were taken, respondents moved for summary judgment. The court granted summary judgment in favor of respondents on the original action and on the counterclaim for attorney fees. The Whites appeal from the order granting the motion for summary judgment. We affirm.

■ This court has set forth the rule that ambiguous earnest money agreements will not support an award of specific performance or damages. *Luke v. Conrad*, 96 Idaho 221, 526 P.2d 181 (1974), *Matheson v. Harris*, 96 Idaho 759, 536 P.2d 754 (1975).

---

1. The entire 9,000 acres was dry farm and had not previously been irrigated.

2. No issue was raised on appeal regarding this claim.

**3**

The description of the land as stated in the earnest money receipt is "all land west of road running south to the Rehn farmstead containing 960 acres Exact acreage to be determined by survey. Price to be adjusted up or down at the rate of $243.00 per acre Cassia County, State of Idaho." There is nothing in the description with which to pinpoint exactly which 960 acres was to be transferred. As such, this description is ambiguous on its face and will not support an award for specific performance or damages. Appellant invites us to apply the standard here which we apply to other ambiguous contracts and allow extrinsic or parol evidence to clarify the terms of the written agreement. We decline to do so. Although this court has never adopted a highly defined standard for determining the sufficiency of a description of land we have adopted a general standard which was set forth in *Allen v. Kitchen*, 16 Idaho 133, 142, 100 P. 1052, 1061 (1909), quoting *Craig v. Zelian*, 137 Cal. 105, 69 P. 853 (1902).

> "An agreement for the sale of real property must not only be in writing and subscribed by the party to be charged, but the writing must also contain such a description of the property agreed to be sold, either in terms or by reference, that it can be ascertained without resort to parol evidence. Parol evidence may be resorted to for the purpose of identifying the description contained in the writing, with its location upon the ground, but not for the purpose of ascertaining and locating the land about which the particular parties negotiated, and supplying a description thereof which may have been omitted from the writing."

See also, *Luke v. Conrad* and *Matheson v. Harris*, both *supra*. The description involved here is so inadequate that to allow parol evidence and the surrounding circumstances to be considered would be to supply a description of the property which was omitted from the writing in order to ascertain and locate the land about which the parties negotiated. As such, the earnest money receipt is unenforceable.

The trial court also awarded attorney fees to respondents. I.R.C.P. 54(e), which states that attorney fees may be awarded only when the court finds that the case is frivolous, only applies to actions filed after March 1, 1979. At the time this action was filed, November 1976, I.C. § 12–121 provided that: "In any civil action, the judge may award reasonable attorney fees to the prevailing party ..." The award of attorney fees was within the discretion of the trial court and appellant has failed to show an abuse of that discretion.

The judgment of the trial court is affirmed. Costs to respondents.

BAKES, C. J., and DONALDSON, J., concur.

SHEPARD, J., concurs in the result.

BISTLINE, Justice, dissenting.

For reasons which I cannot fathom, it seems that the other members of the Court have heretofore taken a firm stance against earnest money agreements, which are for certain the main instrumentality by which the real estate profession operates—not that earnest money agreements are not utilized where real estate brokers and salesmen are not involved. *See Hoffman v. S. V. Company, Inc.*, 102 Idaho 187, 628 P.2d 218 (1981). Today the Court takes its furthest step yet towards making all earnest money agreements *per se* unenforceable in Idaho.

Although I strongly disagree with the reasoning, or rather the lack of reasoning, in the Court's opinion, my primary concern is with those unfortunate people who enter into earnest money agreements thinking that so long as the conditions of the agreement are met, they have a contractual right to purchase the property which is the subject of the agreement. Such is apparently not the law in Idaho. Yet it seems beyond dispute that most, if not all, other jurisdictions hold otherwise.

I.

SPECIFIC PERFORMANCE

A.

Before turning to the merits of the issues presented, it is proper to emphasize the

4

nature of the contract which plaintiffs seek to enforce. Earnest money agreements may be divided very generally into two categories—those which contemplate a sale pursuant to a future land sale contract between the buyer and the seller—*see Luke v. Conrad*, 96 Idaho 221, 526 P.2d 181 (1974)—and those which contemplate closing a sale for cash. *See Pittman v. Thompson*, 45 Or.App. 627, 608 P.2d 1223, 1225 (1980) ("[a]n earnest money agreement may represent the completed agreement of the parties or it may only represent a rough form of what is intended to be followed by a final contract"). The latter category presents fewer problems to courts in which specific performance is sought; when the contract contemplates an exchange of cash for title to property, the possibility of courts imposing contract terms not contemplated by the parties is greatly reduced. As stated in 71 Am.Jur.2d Specific Performance § 41 (1973):

"The terms governing the manner and time of payment of the price agreed upon for property have ordinarily been regarded as such an important part of the agreement that where the alleged contract did not state these terms or expressly left them open for future negotiation, the courts have usually held that the minds of the parties had never in fact met upon the essentials and that a conveyance of the property would not be specifically enforced.

. . . .

"On the other hand, in a number of cases specific performance of a contract for the sale of land has been granted notwithstanding the contention that the agreement was incomplete because of a provision leaving some element of the terms of payment to future negotiation, the courts taking the view that the matters left open were not essential or that the intention of the parties was ascertainable and enforceable notwithstanding this provision. In several of these cases, where the purchaser was seeking performance, the courts have noted the tender of the total price in cash, indicat-ing that this relieved the agreement of any indefiniteness." *Id.* § 41 at 62–64 (footnotes omitted).

In *Ford v. Lord*, 99 Idaho 580, 583, 586 P.2d 270, 273 (1978), in the context of a lease option contract we relied on this distinction in holding:

"Owners' first argument relies on the case of *Luke v. Conrad*, 96 Idaho 221, 526 P.2d 181 (1974), for the proposition that a contract will not be specifically enforced if its terms are too indefinite, uncertain or incomplete to ascertain. In particular, various passages are quoted indicating that a contract is fatally defective when it fails to spell out financing terms. In this case, the only uncertainty regarding financing arrangements arose when the lessees offered to pay the $50,000.00 in cash or to make whatever other financial arrangement that would prove most beneficial to the owners for tax purposes. The doctrine of *Luke v. Conrad*, has no application under such facts."

In *Phillips v. Johnson*, 266 Or. 544, 514 P.2d 1337 (1973), an earnest money agreement gave the buyer the option of paying in installment payments or paying in cash. After refusing to direct specific performance of the somewhat vague installment payment option in the contract, the court noted:

"By these terms plaintiffs were given an election to pay the entire balance of $1,500 in cash and, in such an event, defendants were required to accept payment of that entire balance in cash. Also, in such an event, the failure of the parties to agree upon provisions in a land sale contract or mortgage to insure future payments would become wholly irrelevant and superfluous. Indeed, there would then be no occasion for any land sale contract or mortgage, for the reason that *upon making payment of the total purchase price plaintiffs would thereupon be entitled to receive a deed conveying good and sufficient title* to the property, as defendants undertook to provide by

the terms of the 'Earnest Money Receipt.' " *Id.* at 1344 (emphasis added). *See Hubbell v. Ward,* 40 Wash.2d 779, 246 P.2d 468, 472–73 (1952). *See generally Lewis v. Lockhart,* 379 P.2d 618 (Alaska 1963); Annot., 68 A.L.R.2d 1221, 1231–32 (1959).

The fact that a straight cash purchase is contemplated necessarily reduces the possibility of a court imposing terms which were not actually agreed to by the parties; it also reduces to some extent the need for specificity in written subsidiary terms in the contract. With this in mind, I turn to an examination of the terms of the earnest money agreement.

### B.

Although the Rehns challenge the sufficiency of several terms in the earnest money agreement, the primary issue is whether the Whites' parol evidence should be allowed to clarify or explain those terms. The critical point in the majority opinion is that: "Appellant invites us to apply the standard here which we apply to other ambiguous contracts and allow extrinsic or parol evidence to clarify the terms of the written agreement. *We decline to do so.*" (Emphasis added.)

Two points must be made. First, this is the first time that the issue of whether parol or extrinsic evidence may be used to clarify ambiguous terms in earnest money agreements in an action for specific performance has been presented to the Court. Thus, citation to cases setting forth the general rule that "ambiguous earnest money agreements will not support an award of specific performance or damages" is misleading. The *question* is whether the ambiguity may be *made certain* by extrinsic evidence. The second point is that the majority resolves this rather important question of first impression without *any* explanation of its refusal to allow extrinsic or parole evidence to clarify ambiguous terms in earnest money agreements, when such evidence is allowed to clarify ambiguous terms in virtually *every other type of con-*

*tract, including contracts concerning real property.*

It is true that we have not previously applied the parol evidence rule to earnest money agreements. However, our application of the rule in other contexts should provide some guidance. In *Gardner v. Fliegel,* 92 Idaho 767, 771, 450 P.2d 990, 994 (1969), this Court held that "[w]hen the language of the deed is ambiguous, the intention of the parties must be determined from all the surrounding facts and circumstances." In the context of a contract to lease real property, in *Bergkamp v. Carrico,* 101 Idaho 365, 367, 613 P.2d 376, 378 (1980), we held that "[w]here the terms of a contract are ambiguous, its interpretation and meaning is a question of fact and extrinsic evidence may be considered in attempting to arrive at the true intent of the contracting parties. . . . Moreover, the court *must* try to discover that intent and may scrutinize circumstances surrounding the contract's formation." (Citations omitted.) (Emphasis added.) And in regard to a brokerage agreement, in *Rogers v. Hendrix,* 92 Idaho 141, 146, 438 P.2d 653, 658 (1968), this Court held that "the parol evidence rule does not require exclusion of testimony where a written brokerage agreement itself is not complete and unambiguous as a statement of all the transaction's details." To my mind these principles are as applicable to earnest money agreements as they are to deeds, lease contracts or brokerage agreements. The majority's failure to explain why those principles should not apply to ambiguous earnest money agreements is perplexing in the extreme. The primary goal of courts in considering any contract is to determine whether the parties ever agreed and, if so, what the terms of that agreement were. Unless it is clear from a contract that the document contains every least infinite particular that was intended by the parties to be included, parol evidence must be available as a tool for the court to use in determining the actual intent of the parties. *See Chapman v. Haney Seed Co.,* 102 Idaho 26, 624 P.2d 408, 413 (Bakes, C. J., dissenting). With these principles in mind,

I turn to an examination of the terms of this earnest money agreement.[1]

### 1. Description of the Land.

The earnest money agreement contains the following description of the land to be conveyed: "All land west of the road running south to the Rehn farmstead containing 960 acres, exact acreage to be determined by survey. . . . Cassia County, Idaho." This description is *not*, as asserted by the majority, ambiguous, but it *is* somewhat indefinite. In determining whether a land description in a contract is sufficiently definite to support a decree for specific performance, parol evidence may be introduced so long as the description which *is* given provides the key to the actual parcel that the parties intended to transfer.[2] As stated in *Beverage v. Canton Placer Mining Co.*, 43 Cal.2d 769, 278 P.2d 694, 698 (1955), "a description fulfills the test of reasonable certainty if it furnishes the 'means or key' by which the description may be made certain and identified with its location on the ground." In the context of the statute of frauds, we recently held that "the statute of frauds [does not invalidate] all contracts with imperfect legal descriptions. 'The statute is not pressed "to the extreme of a literal and rigid logic." ' *Jennings v. Ruidoso Racing Association*, 79 N.M. 144, 441 P.2d 42, 44 (1968)." *Russell v. Russell*, 99 Idaho 151, 153, 578 P.2d 1082, 1084 (1978). Furthermore, "[a] description is sufficiently definite if it evidences the common intent of the parties to deal with respect to a particular piece of property." *Id.* at 155, 578 P.2d at 1086 (Bistline, J., concurring specially). "If the language is such that, *without being contradicted or added to*, it can with the aid of proper extrinsic evidence be connected with and applied to the very property intended to the exclusion of all other property it is sufficient." Annot., 23 A.L.R.2d 6, 17 (1952) (footnote omitted) (emphasis added).

I see no distinction between allowing parol evidence to clarify a legal description in

---

1. I note that the statute of frauds was not raised as an affirmative defense below, as required by I.R.C.P. 8(c), and the majority does not base its holding on the sufficiency of the property description in the earnest money agreement to meet the statute of frauds.

2. The parol evidence rule has a somewhat different application in this context; while a legal description may not be ambiguous in the sense that its meaning is unclear, it may be indefinite in the sense that the exact boundaries of the land intended to be conveyed cannot be determined without resort to extrinsic evidence.

I am somewhat intrigued at the majority's citation to *Allen v. Kitchen*, 16 Idaho 133, 100 P. 1052 (1909), which specifically provides, in the very passage quoted by the majority, that " '[p]arole evidence *may be resorted to* for the purpose of identifying the description contained in the writing, *with its location upon the ground*, but not for the purpose of ascertaining and locating the land about which the parties negotiated, and supplying a description thereof which they have omitted from the writing.' " 16 Idaho at 142, 100 P. at 1055 (quoting *Craig v. Zelian*, 137 Cal. 105, 69 P. 853 (1902). In *Allen*, the description did not include the state, county or civil or political district in which the property was located. Here, of course, these factors are clearly set forth. The *Allen* Court went on to say that "[i]f the writing contained anything from which the name of the civil or political subdivision or municipality to which these tracts are additions could be ascertained, then oral evidence would be admissible to apply the description contained in the writing to the lands as marked and bounded either by recognized legal subdivisions or by metes and bounds." 16 Idaho at 144, 100 P. at 1055. In *Campbell v. Weisbrod*, 73 Idaho 82, 245 P.2d 1052 (1952), a case in which the plaintiffs sought to quiet title and oust the defendants, the Court allowed parol evidence to be introduced to clarify an ambiguous legal description in a deed, stating:

"The fundamental principle underlying all of the rules of construction of deeds, as well as all other contractual instruments, is that the courts must seek and give effect to the intention of the parties.

. . . .

The particular rule applicable here is that where the seller and the buyer go upon the land and there agree upon and mark the boundary between the part to be conveyed and the part to be retained by the seller, *the line thus fixed controls the courses and distances set out in the deed* executed to effectuate the division agreed upon." 73 Idaho at 89, 245 P.2d at 1057 (citations omitted) (emphasis added).

So long as the *parcel* that the parties are dealing with is apparent from the written agreement, Idaho precedent clearly allows introduction of parole evidence to clear up any ambiguities in the *exact* boundaries of the parcel.

order to meet a defense based on the statute of frauds and allowing parol evidence to clarify a legal description to meet a defense based on lack of sufficiency to compel specific performance.[3] In both cases, the Court's primary duty is to enforce, to the extent possible, the intent of the parties at the time that they entered into the contract. *See Interform Co. v. Mitchell,* 575 F.2d 1270, 1277 (9th Cir. 1978). If one examines the maps which plaintiffs have submitted with their briefs, it is at once obvious that the earnest money agreement could *only* be referring to a 960 acre parcel, owned at the time by Anna Rehn and the estate of Conrad Rehn, lying immediately west of a county road running to the "Rehn farmstead."

It also appears from the record, when viewed in the light most favorable to the party against whom summary judgment was entered,[4] that the Rehns simply changed their minds after entering into the earnest money agreement with the Whites, and decided to sell to Vernon Rehn's brother and his wife, rather than to the Whites. In a similar context in *Russell v. Russell,* 99 Idaho 151, 153, 578 P.2d 1082, 1084 (1978), this Court then in a somewhat more equitable mood, stated:

> "Buyer's only reason for raising a question about the legal description was an attempt to absolve himself of a contract he had signed.
>
> " 'The statute of frauds is intended to protect against fraud; it is not intended

as an escape route for persons seeking to avoid obligations undertaken by or imposed upon them.' "

Since the land description here would be sufficient to satisfy the statute of frauds and allow the introduction of extrinsic evidence, if such is available, to resolve any uncertainties in regard to the description,[5] I would remand the case to allow the Whites to introduce extrinsic evidence to resolve any uncertainties regarding the exact boundaries of the property and in support of their request for specific performance.

2.  Purchase Price and Terms.

The purchase price as set forth in the earnest money agreement is "960 acres. Exact acreage to be determined by survey. Price to be adjusted up or down at the rate of $243.00 per acre plus $12,000 cash.... The total purchase price of ($233,280.00) two hundred thirty-three thousand two hundred eighty dollars shall be payable as follows:  $5,000.00 which represents the aforesaid deposit, ... $228,280.00 on delivery of deed ... which shall be on or before July 1, 1976...." As I have previously noted, no terms remained to be ironed out since a cash sale was contemplated. A clear formula is presented for adjusting the price should a survey of the agreed upon parcel reveal that more or less acreage is present than was represented. This is sufficient to support a decree for specific performance. *See Garmo v. Clanton,* 97 Idaho 696, 551

---

3.  I do not address the issue of whether a legal description which is sufficient to satisfy the statute of frauds will in all cases be sufficient to decree specific performance. The need to resort to extrinsic evidence in this case, however, suggests that it may not.

4.  "In determining whether an issue of material fact is in dispute, facts should be liberally construed in favor of the party against whom summary judgment is sought and all doubts are to be resolved against the moving party." *Ashby v. Hubbard,* 100 Idaho 67, 69, 593 P.2d 402, 404 (1979).

5.  I note that the applicable statute of frauds, I.C. § 9–505, provides in part:
    "In the following cases the agreement is invalid, unless the same or some note or

memorandum thereof be in writing and subscribed by the party charged ...
    . . . .
    "5.  An agreement ... for the sale, of real property...."
The description here, which is in writing and signed by the parties involved, identifies the state and county in which the land is located, the total acreage to be conveyed, and two monuments—a road and a farmstead which belong to the seller. This is more than sufficient to satisfy the statute of frauds. *See Russell v. Russell,* 99 Idaho 151, 578 P.2d 1082 (1978) (Bistline, J., concurring specially); *Allen v. Kitchen,* 16 Idaho 133, 100 P. 1052 (1909); Annot., 23 A.L.R.2d 6, 55–60 (1952) and Later Case Service at 605–09 (1970).

P.2d 1332 (1976); *Ford v. Lord*, 99 Idaho 580, 586 P.2d 270 (1978); Corbin on Contracts § 97 at 424 (1963).

### 3. Remaining Terms and Boilerplate.

The remaining terms of the agreement are clearly sufficient to support a decree of specific performance. The risk of loss and proration of taxes and other expenses are specifically provided for, as is the time of execution and delivery of the deed.

The agreement does contain the following language:

> "It is understood and agreed that the terms written in this receipt constitute the entire Preliminary Contract between the purchaser and the seller, and that no verbal statement made by anyone relative to this transaction shall be construed to be a part of this transaction unless incorporated in writing herein. It is further agreed that execution of the final contract shall abrogate this Earnest Money Receipt and Offer to Purchase."

The earnest money "form" in which this clause is found was written to cover both situations in which a future contract is contemplated and situations in which a cash sale is contemplated. The references to "Preliminary contract" and "execution of the final contract" are obviously inapplicable in the present context. The references are also in conflict with the handwritten terms requiring a cash sale. To the extent that the printed terms are inconsistent or in conflict with the handwritten terms, the handwritten terms control. *In re Estate of Sanderson*, 510 P.2d 452 (Colo.App.1973); *Desbien v. Penokee Farmer's Union Coop., Ass'n*, 220 Kan. 358, 552 P.2d 917 (1976); *Bank of Ephraim v. Davis*, 559 P.2d 538 (Utah 1977). The rest of the clause was clearly intended to protect the seller and broker against actions based on misrepresentation. At the most, it merely restates the parol evidence rule and does not by its terms bar the admission of extrinsic evidence to aid the court in interpreting the agreement and arriving at the true intent of the parties.

### C.

The Rehns contend that, since neither Vernon nor Karen Rehn acknowledged their signatures on the earnest money agreement as required by I.C. § 32–912, the agreement cannot be enforced against them. I.C. § 32–912 provides:

> "Control of community property.—Either the husband or the wife shall have the right to manage and control the community property, and either may bind the community property by contract, except that neither the husband nor wife may sell, convey or encumber the community real estate unless the other joins in executing and acknowledging the deed or other instrument of conveyance, by which the real estate is sold, conveyed or encumbered . . . ."

This section imposes the requirement of acknowledgment only upon conveyances or encumbrances of community real estate. No community real estate is involved here. Vernon and Karen Rehn had only a right of first refusal on the subject property. Since their interest cannot be classified as real estate, the statute is simply inapplicable. *See Boesiger v. DeModena*, 88 Idaho 337, 399 P.2d 635 (1965). The fact that the Rehns would first have to exercise their option and then convey the property does not change the outcome; the property would be acquired by the Rehns subject to the agreement to convey contained in the earnest money agreement, and there is no requirement of acknowledgment in the *acquisition* of community property, no matter how that property may be encumbered. *See Morgan v. Firestone Tire & Rubber Co.*, 68 Idaho 506, 201 P.2d 976 (1948).

### II.

### INTERFERENCE WITH CONTRACT

In addition to claims against Vernon and Karen Rehn for specific performance or damages, the Whites' complaint charges William and June Rehn with interference with contract. In *Barlow v. International Harvester Co.*, 95 Idaho 881, 893, 522 P.2d 1102, 1114 (1974), which involved an action

for interference with contract, it was held that "[p]rotection is extended against unjustifiable interference with contracts even though the contract is voidable or unenforceable in an adversary proceeding." (Footnote omitted.) Accordingly, the action against William and June Rehn should not be affected by the Whites' ability to enforce the contract against Vernon and Karen Rehn.[6] While it is true that the Whites did not assign dismissal of this count as error in their brief, it was so clearly wrong to dismiss the count that this Court should exercise its equitable powers to correct the error.

### III.

### BRIEF ADDITIONAL COMMENT

Appellants have provided the Court with one of the finest briefs which it has been my pleasure to read. As a part of that brief the appellants have, by a series of transparent overlays, set out a map of the original Rehn farm, from which the parcel in question was being sold. These overlays readily demonstrate to even the most unresponding mind that there was not a scintilla of doubt in anyone's mind as to what the parties had agreed would be sold and purchased. Unfortunately there is no feasible way to incorporate the same into this opinion. But, as is not generally known, the clerk of this Court retains the file of this case, including the briefs, and interested readers and commentators who may have occasion later on to challenge the validity of today's opinion can have the benefit of that brief.

Seeing that the Court's opinion in this case is as legally untenable as *Hoffman v. S. V. Company, Inc., supra*, I can only *caveat* the trial bench and bar that it may well be impossible in this state to attempt real estate transactions without having attorneys in constant attendance *ab initio.* The

untutored parties in *Hoffman* put their deal together just as businessmen do all over the country. A recalcitrant seller was able to renege, and this Court obliged by refusing to consider the doctrine of implied reference. Here the parties were aided and guided throughout by a skilled banker and a broker. The result is the same.

I dissent.

---

6. I also note that the fact that the property is now in the hands of William and June Rehn does not necessarily bar specific performance. The sale to William and June occurred *after* the earnest money agreement with the Whites had been entered into, and if William and June

Rehn were aware of the prior contract, they are not protected as bona fide purchasers. *See Farm Bureau Finance Co. v. Carney*, 100 Idaho 745, 605 P.2d 509 (1980); *Garmo v. Clanton*, 97 Idaho 696, 551 P.2d 1332 (1976); *Langroise v. Becker*, 96 Idaho 218, 526 P.2d 178 (1974).