645 P.2d 350

Otis E. KLINE, Jr., and Miriam R. Kline, husband and wife; Ross E. Wait and Shirley Wait, husband and wife; and George W. Lindell and Linda Lindell, husband and wife, Plaintiffs-Appellants,

v.

Vernon B. CLINTON and Rosemary Clinton, husband and wife; Acequia, Inc.,; and Clinton Ranch, Inc., Defendants-Respondents.

No. 13525.

Supreme Court of Idaho.

May 7, 1982.

Michael R. Orme of Hansen, Boyle, Beard & Martin, Chartered, Idaho Falls, for plaintiffs-appellants.

Gary L. Cooper of Racine, Huntley & Olson, Pocatello, for defendants-respondents.

BAKES, Chief Justice.

Appeal is taken from a partial summary judgment on plaintiffs' amended complaint seeking to judicially establish a partially written, partially oral contract for the purchase of a large ranch known as the Clinton Ranch, and from the expungement of a purchaser's lien and *lis pendens* filed by plaintiff appellants.

Plaintiff appellants herein are Otis Kline, George Lindell and Ross Wait. Defendant respondents are: Vernon B. Clinton and Rosemary H. Clinton, husband and wife; Acequia, Inc., the record owner of most of the real property involved in this dispute, its president and sole stockholder being Vernon B. Clinton; and, Clinton Ranch, Inc., the operating company which operated the farm and ranch enterprise conducted on the real property prior to November, 1976.

In the summer of 1976, plaintiffs and defendants entered into negotiations in regard to the purchase of Clinton Ranch. The trial court found that Kline, Lindell and Wait prepared financial statements in order to induce Vernon Clinton to enter into negotiations and to enable them to acquire the farm ranch property. The prospective buyers sent financial statements to Vernon Clinton in which they misrepresented their financial status. Kline represented that he owned a Time Certificate of Deposit (TCD) valued at $500,000. In fact, the record discloses that neither Kline, nor Lindell nor Wait ever owned the TCD; instead, they had rented it and arranged with the owner to advise anyone who called seeking ownership verification that Kline owned the TCD. The trial court determined that Kline's financial statement represented his net worth at $1,268,000 when his actual net worth was approximately $760,000. Lindell and Wait also overstated the values of their assets, representing each of their net values to be in excess of $200,000, when in fact they were between $50,000 and $100,000.

It is apparent from the record that Vernon Clinton also made misrepresentations. There was evidence in the record that during negotiations Clinton represented that the Clinton Ranch had an appraised value of $15.4 million, while subsequent appraisals established the value of Clinton Ranch to be $5 million less than represented. Furthermore, the written agreements subsequently entered into by Clinton through his corporation, Acequia, Inc., the nominal seller, identified certain livestock and property to be included in the sale. Although all livestock listed in the agreement carried the Clinton Ranch brand, this livestock did not in fact belong to Acequia, Inc., the seller, but to Hailey Livestock, a sole proprietorship conducted exclusively by Rosemary Clinton. Finally, Clinton admitted that a 320-acre portion represented as part of the Clinton Ranch to be sold by Acequia, Inc., was in fact owned by Hailey Livestock. With the misrepresentations of both parties piercing the very foundation of their relationship, the eventual disagreements giving rise to this suit are hardly surprising.

The parties first entered into a memorandum agreement on September 10, 1976, which is contained in the record. This agreement provided for a purchase price of $12 million, with a down payment of $4 million. The balance was to be paid in semiannual installments at an interest rate of 8% per annum. The memorandum agreement stated that the offer was subject to the plaintiffs being able to obtain a $5 million loan. With this loan, the plaintiffs were to make the $4 million down payment and use the additional $1 million exclusively for capital improvement expenses. The September agreement further provided that the parties would execute a real estate contract outlining payment of the balance of the purchase price.

The plaintiff buyers were unable to obtain financing and offered to forego the purchase. Defendants rejected this proposal and suggested that the plaintiffs' purchase of Clinton Ranch be subject to no down payment and the balance be paid in more lenient terms. These proposals led to another written agreement, the October 18, 1976, memorandum.

The October memorandum agreement continued to contemplate a purchase price of $12 million, with a payment on or before May 1, 1977, of $200,000 and a payment on or before the first day of November, 1977, of $550,000; additional payments of interest at 8% per annum were to be made on May 1, 1978, and November 1, 1978, and on the first day of May and November thereafter. Principal payments were to be made on the first day of November in 1980, 1982, and 1984, with a final payment on November 1, 1986. Alternatively, in the event permanent financing was obtained, the provisions relating to the payment of the down payment and the use of the proceeds of a $5 million loan as set out in the September 10, 1976, memorandum agreement would go into effect. The terms of the October agreement further provided that on or before December 1, 1976, the parties would enter into "an agreement detailing each and every condition of [the] transaction."

Plaintiffs formed the Clinton Ranch Partnership and took possession of the ranch on November 1, 1976, as provided in the October 18, 1976, memorandum agreement. In their depositions, plaintiffs claim that in anticipation of a final purchase agreement they invested substantial sums of their own money in ranch operations, totaling $70,000 by January, 1977, and began to incur and pay all bills. The record before the lower court showed that plaintiffs created a tax shelter investment, representing themselves as owners of Clinton Ranch, and sold interests to limited partner investors to raise additional operating funds. Plaintiffs invested $92,500, half the money raised, directly into ranch operations. Ultimately, the money raised by the tax shelter device was repaid to the investors, the $92,500 put into operation of the ranch being paid back from money advanced by Vernon Clinton. Additionally, in March, 1977, Clinton Ranch Partnership sold the cattle on the ranch owned by Hailey Livestock for $123,000 and used the funds raised to run the ranch.

Plaintiffs remained unsuccessful in their efforts to secure financing. The record dis-

closes that in late January, 1977, Vernon Clinton and Clinton Ranch Partnership met to "clear the air." Plaintiffs claim at that meeting to have advised the defendant that the TCD was non-existent; however, they admittedly did not go into detail regarding the extent of exaggeration or overstatements on their financial statements. Plaintiffs again offered to abandon the purchase, but allege that defendant insisted that the meeting would effect no changes in their existing relationship and proposed that thereafter they join in their efforts to procure the financing contemplated by the memorandum agreements. Plaintiffs also claim that defendant, at that meeting, orally agreed that the earnings from the operation of the ranch would be the source for unscheduled periodic purchase payments and that defendant would put up the Clinton Ranch as security for a loan, if acquired. Plaintiffs allege that these statements form the basis of the oral modifications which plaintiffs sought to rely upon in the trial court.

On the other hand, defendant claims he was told only that plaintiffs could not borrow against the TCD or withdraw the $500,000. Defendant also maintains that Clinton Ranch Partnership status was left undefined, but that he allowed them to continue to operate the Clinton Ranch property in the fashion previously operated without agreeing to any oral modifications of the existing agreements. The record establishes that the parties never entered into a final written agreement detailing each and every condition of the transaction. However, plaintiffs continued to operate the ranch for nearly another year and a half.

In April, 1977, defendant began advancing operating funds to Clinton Ranch Partnership. Many of these loans were evidenced by promissory notes indicating the obligation of Clinton Ranch Partnership to defendant. Additional operating funds were obtained by plaintiffs from the sale of livestock, crops and equipment.

In the summer of 1977, Vernon Clinton and Acequia, Inc., obtained a $4 million loan from Prudential Insurance Company on the Clinton Ranch. Plaintiffs claim this transaction was pursuant to the agreement to jointly pursue financing, and that the loan satisfied the September memorandum agreement's requirement, as orally modified, that they obtain a loan for $5 million. In direct conflict, Vernon Clinton maintains that he alone obtained the loan and that there was no oral modification to the effect that the loan obtained in his name was pursuant to and satisfied the September memorandum agreement. The record discloses that defendant put up Clinton Ranch as security for the loan and paid the $40,000 commitment fee. The only document signed by plaintiffs in regard to the loan transaction was a disclaimer, disclaiming any ownership rights in the equipment and real estate. The disclaimer states, and defendant maintains, that plaintiffs' status in regard to the ranch and equipment was merely as lessees for the crop year 1977. Plaintiffs, however, claim to have signed the disclaimer only upon defendant's positive representations that such disclaimer was necessarily a part of their joint effort to acquire the loan, particularly to satisfy the lender's requirements, and that acquisition of this loan would fulfill the conditions contemplated by the memorandum agreements as orally modified.

Defendant Vernon Clinton retook possession and operation of the Clinton Ranch on June 1, 1978, after plaintiffs had been in possession for twenty months. Immediately thereafter, plaintiffs filed a complaint alleging various legal theories of recovery pleaded in the alternative. In Count I of their amended complaint, plaintiffs contended that they were contract purchasers of the real and personal property, and sought rescission of the contract and punitive damages. In Count II, plaintiffs alleged that they were contract purchasers of the property and sought foreclosure of a purchaser's lien they had filed against the property. The remaining counts include claims for accounting relief with which we are not here concerned. Defendants counterclaimed against plaintiffs, demanding that a receiver be appointed to market and sell crops and that they be declared entitled

to possession, and seeking an accounting between the parties.

The trial court granted defendant's motion for partial summary judgment directed to Counts I and II of plaintiffs' amended complaint, concluding that there were no issues of material facts, and ordered that the purchaser's lien and *lis pendens* filed by plaintiffs be expunged. Plaintiffs thereafter filed a Motion to Vacate and Revise Judgment on Defendant's Motion For Partial Summary Judgment with supporting affidavits, on the basis of new evidence of plaintiff's purchaser status. The trial court denied the motion, finding insufficient evidence as to material terms of the alleged contract or mutual final oral agreement. The judgments on Counts I and II of plaintiffs' amended complaint were certified for appeal pursuant to I.R.C.P. 54(b), and plaintiffs appeal.

The critical issue in this appeal is whether the district court erred in granting defendant respondents' motion for partial summary judgment. For reasons adduced below, we hold that the district court did so err.

■ I.R.C.P. 56(c) provides that a motion for summary judgment "shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Several rules of construction aid in the interpretation and application of this rule. If uncontroverted facts lead to a definite disposition as a matter of law, summary judgment is appropriate. *Smith v. Boise Kenworth Sales, Inc.,* 102 Idaho 63, 625 P.2d 417 (1981). Furthermore, a mere scintilla of evidence will not create a genuine issue of material fact sufficient to preclude summary judgment. *Straley v. Idaho Nuclear Corp.,* 94 Idaho 917, 500 P.2d 218 (1972).

■ On the other hand, in ruling on a summary judgment motion the facts are to be liberally construed in favor of the party opposing the motion; he is to be given the benefit of all favorable inferences which might reasonably be drawn from the evidence. *Taylor v. Choules,* 102 Idaho 222, 628 P.2d 1056 (1981); *Huyck v. Hecla Mining Co.,* 101 Idaho 299, 612 P.2d 142 (1980). Summary judgment is improperly granted where any genuine issue of material fact remains unresolved. *Taylor v. Choules, supra; Smith v. Boise Kenworth Sales, Inc., supra; Palmer v. Idaho Bank & Trust of Kooskia,* 100 Idaho 642, 603 P.2d 597 (1979); *Straley v. Idaho Nuclear Corp.,* 94 Idaho 917, 500 P.2d 218 (1972). If the record contains conflicting inferences or reasonable minds might reach different conclusions, a summary judgment must be denied. *Farmers Ins. Co. of Idaho v. Brown,* 97 Idaho 380, 544 P.2d 1150 (1976); *Stewart v. Hood Corp.,* 95 Idaho 198, 506 P.2d 95 (1973); *Merrill v. Duffy Reed Constr. Co.,* 82 Idaho 410, 353 P.2d 657 (1960).

■ Viewing the evidence in a light most favorable to the plaintiffs, we hold that genuine issues of material fact do exist as to whether the September and October agreements were orally modified by mutual agreement of the parties, thus creating an enforceable purchase agreement.

The September memorandum agreement constituted an offer by plaintiffs to purchase Clinton Ranch under the terms set forth above. Paragraph 13 of the agreement makes the offer subject to the approval of the defendants. Vernon Clinton signed and executed the agreement in his name and continued to negotiate the purchase with the plaintiffs, thereby indicating acceptance of the plaintiffs' offer.

When financing proved too difficult to obtain, the parties negotiated and entered into another written agreement, dated October 16, 1976, which established more lenient purchase terms and required no down payment, unless the plaintiffs were able to obtain a loan, in which event the payment provisions set out in the September memorandum agreement were to apply. The October agreement provided in part:

"In consideration of the promise of each party to the other herein contained, seller hereby agrees to sell to purchaser, and purchaser hereby agrees to buy from sell-

er, on the terms and conditions and for the purchase price hereinafter set forth, the property herein described."

The terms of the purchase were set out in detail, although in paragraph 9 the parties agreed that on or before December 1, 1976, they would enter into a final written agreement detailing each and every condition of this transaction. Assuming that this October agreement would have been an adequate written purchase agreement, plaintiffs admit, however, that they made none of the payments required by the October 16, 1976, agreement; that failure, without more, might have provided a proper basis for a partial summary judgment in favor of the defendant respondents. However, the deposition testimony submitted by the plaintiffs recites that at a January, 1977, meeting between plaintiffs and defendant Clinton, the September and October written agreements were substantially orally modified in the following particulars: that the plaintiffs and defendants would jointly pursue a loan to facilitate the purchase of the ranch; that if a loan was secured, it would be applied to the purchase price as set out in the September memorandum agreement; that in the interim plaintiffs would be permitted to make unscheduled periodic payments from the earnings of the ranch, if any, to be applied to the purchase price. The plaintiffs' deposition testimony further asserts that at subsequent meetings later in the year other oral modifications were made with the defendant Clinton, including the claim that the financing which Clinton obtained in the summer of 1977 satisfied the plaintiffs' obligation for a down payment pursuant to the September and October agreements.

While the defendants contest and deny the claim of oral modifications, there nevertheless is a substantial dispute of a material issue of fact concerning those oral modifications.

 The trial court, reviewing the foregoing record, concluded that there was no meeting of the minds regarding the final purchase agreement stating: "The plaintiffs are required to show by clear and convincing evidence the terms of any oral agreement. They cannot do so." This Court has previously held that in order to prove an oral modification of a written agreement a party must establish the oral modifications by clear and convincing evidence. *Resource Engineering, Inc. v. Siler*, 94 Idaho 935, 500 P.2d 836 (1972); *Thomas v. Ballou Latimer Drug Co.*, 92 Idaho 337, 442 P.2d 747 (1968). While proof of an oral modification by clear and convincing evidence is the appropriate burden of proof at the trial of a matter, at the summary judgment stage the function of the trial court is not to weigh the evidence or to try the factual issues by whatever standard is appropriate to the case, but merely to determine whether or not there exists any genuine issue of material fact as adduced from the entire record. *Simpson v. Mountain Home School Dist. No. 193*, 99 Idaho 845, 590 P.2d 101 (1979); *In re Killgore's Estate*, 84 Idaho 226, 370 P.2d 512 (1962).

Construing the facts in the record in favor of the plaintiff appellants, and giving them the benefit of all favorable inferences which may be drawn therefrom, we conclude that genuine issues of material fact exist regarding whether the written memorandum agreements were orally modified, creating an enforceable purchase agreement. In our view of the record, reasonable minds could differ regarding these factual issues, and summary judgment was therefore inappropriate.

The partial summary judgment entered by the trial court is reversed and the cause remanded for further proceedings. Costs to appellant.

McFADDEN, BISTLINE and SHEPARD, JJ., concur.

BISTLINE, Justice, concurring.

The trial bench and bar will likely be startled, but pleased to see the Court retreating so quickly from the views which governed a contrary result in *White v. Rehn*, 103 Idaho 1, 644 P.2d 323 (1982).

**122**

DONALDSON, Justice, dissenting.

Everyone agrees that the terms of the September 10, 1976 agreement and the October 18, 1976 memo modifying the September 10, 1976 agreement were never met. However, the majority claims there is a dispute in the facts as to possible oral modification of these agreements.

The September 10, 1976 agreement provided that the "Seller and purchaser agree to execute a Real Estate Contract for the balance of the purchase price in a form mutually agreeable to buyer and seller." This was never done. The October 18, 1976 memo provided that "this is a Memorandum Agreement and that on or before December 1, 1976, they will enter into an agreement detailing each and every condition of this transaction." This was never done.

If there was never an agreement reached which could be enforced, oral modifications are meaningless. This Court has often held that for a contract to exist there must be a distinct and common understanding between the parties. *E.g., Hoffman v. S V Company, Inc.,* 102 Idaho 187, 189, 628 P.2d 218, 220 (1981); *Mitchell v. Siqueiros,* 99 Idaho 396, 400, 582 P.2d 1074, 1078 (1978); *Brothers v. Arave,* 67 Idaho 171, 174 P.2d 202 (1946). Here, the plaintiff Kline admits that there never was a meeting of the minds as to the method and manner of payments.

Because the September and October memoranda were incomplete and left material terms for future determination or written memorialization, there was no enforceable contract subject to oral modification. *See, e.g., Luke v. Conrad,* 96 Idaho 221, 526 P.2d 181 (1974); *Anderson v. Whipple,* 71 Idaho 112, 125, 227 P.2d 351, 359 (1951); *Brothers v. Arave, supra.*

I would uphold the decision of the trial court that there was no meeting of the minds regarding the material terms and conditions of the final purchase agreement.