**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, an Illinois Corporation, Plaintiff,**

v.

**Larry Duane GUDMUNSON, Sharmon Kay Gudmunson, Jeffrey Brian Jones, Jack Jones, and Peggy Stevenson, Defendants.**

No. CV 79–58–M.

United States District Court,
D. Montana,
Missoula Division.

Aug. 20, 1980.

---

Richard Ranney, Williams Law Firm, Missoula, Mont., for plaintiff.

Edward A. Cummings, Missoula, Mont., for defendant Stevenson.

Norman C. Robb, Missoula, Mont., for defendant Jones.

Gudmunson had no counsel.

## OPINION

RUSSELL E. SMITH, District Judge.

On June 29, 1978, Sharmon Kay Gudmunson (Sharmon) was driving a 1967 Jeepster automobile with a passenger, Peggy Jean Stevenson (Peggy). The car overturned, and Peggy received serious injuries. The Jeepster was owned by Jeffrey Brian Jones (Jeff), who was insured by Allstate Insurance Company.

On June 29, 1978, Larry Duane Gudmunson (Larry) owned two motor vehicles. These vehicles were insured by State Farm Mutual Automobile Insurance Company (State Farm) with combined limits of $150,-000.00. Sharmon was the daughter of Larry and, at the time of the accident, was residing in the same household with him and her mother, Betty Gudmunson (Betty).

The only question in the case is whether the Jeepster "was furnished or available for the frequent or regular use" of Sharmon. If it was, the State Farm policies did not cover her at the time of the accident; if it was not, she was covered by the policies.

Sharmon and Jeff met as high school seniors in 1977. They both graduated on May 30, 1978, and sometime in June 1978 they were engaged to be married. Jeff lived in his parents' home and, as noted, Sharmon lived with her parents. The residences were about twelve miles apart. In the first six months of 1978, Jeff was employed in a job in which he worked four to five days a week, with a work day from 3:00 P.M. to 9:00 or 11:00 P.M. The Jeepster was his only means of transportation to and from work, a distance of four miles each way. He permitted Sharmon to drive the Jeepster, and she did so. Except for a period noted later in this opinion, Sharmon did not have the keys to the car. Her use of the car was generally conditioned on her being able to get from her home to Jeff's home, where the car was kept. Jeff's inclination was to accommodate Sharmon, but her use of the car was dependent upon the prior satisfaction of his needs for it. During a period of about seven days during the first or second week of June 1978 Jeff was out of town, and the Jeepster was left at the Gudmunson residence. While Larry was asked to and did make some minor repairs on the Jeepster, it was available during that one week for regular use by Sharmon. However, well before the date of the accident, the Jeepster was back in

the possession of Jeff, and Sharmon's use of it returned to that previously described.

On the night of the accident Sharmon and Jeff attended a party at the home of Peggy. At about 11:00 P.M. Sharmon received Jeff's permission to use the Jeepster to go to her home and get some clothes so that she could spend the night at the Stevenson home. After returning to the party, and some time later, Sharmon, without the express permission of Jeff and without his knowledge, left the party with Peggy to get a bathing suit from her home. While on this trip the accident occurred. There is no issue as to Jeff's consent to the use of the Jeepster.

■ There is nothing in the evidence which would warrant a finding that the Jeepster was furnished to Sharmon or that she made regular use of it, with the possible exception of the period when Jeff was out of town, and the problem boils down to whether at the time of the accident the car was available for her frequent use. I find that Sharmon did use the Jeepster frequently.[1] It is somewhat paradoxical that a finding of frequency of use does not compel a ruling that the car was "available" for frequent use since, had it not been available, it would not have been used. But the policy uses the words, "furnished or available for the frequent or regular use," and if frequency of use is all that is required, then the words "furnished or available" are used without meaning. I believe that those words as used mean that there be some right in the borrower to use the car without satisfying more than minimal conditions precedent.[2] While the cases do not express the rule in this language, it seems to me that basically that is what the courts have done on a case-by-case basis.[3]

■ I conclude that the Jeepster was not available for Sharmon's frequent use and that there were more than minimal conditions precedent to her use of it.[4] The word

---

[1] In finding that Sharmon made frequent use of the Jeepster, I have treated as substantive evidence the statements given by Larry, Jeff, Betty, and Sharmon to the investigators for State Farm.

Sharmon, Larry, and Jeff were parties to the action, but as I see it only Sharmon's statements could be viewed as an admission under Fed.R.Evid. 801(d)(2). She was vitally interested in the coverage of the policy, but neither Larry nor Jeff had any financial interest in the outcome of this action. They were not liable to Peggy under any circumstances. I think that the plaintiff in a declaratory judgment action should not, by joining parties who have no real adverse interest, be able to convert ordinary witnesses into defendants whose statements are admissions. Whatever may be the theories underlying the receipt of admissions (see 4 Weinstein's Evidence ¶ 801(d)(2)[01] (1979)), none of them would support admissibility where the person making the statement could not be affected by any judgment entered and is a party only because an adversary chose to name him.

All of the persons named were called as witnesses by the defendants, and the defendants knew that all of them had given statements to the adjuster. The statements were contradictory to the evidence given at the trial and were properly admitted for impeachment. In this case I believe the statements were admissible as substantive evidence under Fed.R.Evid. 803(24). The statements were offered as evidence of a material fact, i. e., the frequency of the use of the Jeepster. That fact was more readily provable by those close to Sharmon— her parents and her fiancee, the owner of the Jeepster—than any other persons. The interests of justice are best served by the admissions of the statements. There was no reason to prevaricate when the statements were taken. The facts involved were simple, even if those giving the statements were not aware of the importance of them when the statements were taken. The persons making the statements were all in court subject to examination. Formal notice of an intent to use the statements as substantive evidence was not given, but the defendants, who knew of the statements and should have known that they could be properly used for the impeachment of the defendants' witnesses were in exactly the same position as if some formal notice had been given.

[2] This conclusion of law establishes a rule governing all insurance policies using identical wording.

[3] See Annot. 86 A.L.R.2d 937, Later Case Service, p. 399 (1979).

[4] I make this conclusion as one of fact. The problem is not simply one of determining from conflicting evidence what the facts are because, after that is done, there still remains the problem of determining which of the possible variants in the meaning of a word should characterize the facts found. It could not be suggest-

"available" has some stretch, and in one sense a thing is "available" unless it is unavailable under any circumstances. But on any given day the Jeepster was available to Sharmon only if on that day she could somehow solve the logistics of getting to Jeff's home in order to drive him to work. That in turn involved his schedule, her schedule, and the distance between her home and Jeff's home, where the car was stored. In short, the Jeepster was available only when a combination of circumstances, which varied from day to day, came into a proper juxtaposition. In my opinion there were more than minimal conditions precedent to Sharmon's use of the Jeepster.

I conclude that Sharmon was covered by the State Farm policies.

The defendants will prepare a judgment under the provisions of Rule 14(b) of the Rules of this Court and will bear in mind the fact that the case was dismissed as to Jack Jones.

ed. that the word "frequent" means the same thing when applied to smoking a cigarette, climbing a mountain, or going to church. In the last-mentioned activity, the word "frequent" might be applied differently when referring to persons living in a Las Vegas hotel than when referring to those living in a religious commune. In a similar vein, a tennis court in a private country club is probably available to each member of the club. The tennis court in a public park is available to the public. But is a tennis court in a park in a crowded city available to a twelve-year-old girl? As a practical matter that depends on how many persons want to use the court, whether the court is policed and, if policed, what preference is given to adults over minors; or if not policed, how big and aggressive the potential users are. For reasons of policy, if none other, I think that the variants in the meaning of common words should be considered by the finder of fact— normally a jury. Words used in an insurance policy should be given the meaning which the community would generally give them. A jury chosen from the community is probably better equipped to apply community meanings than is a judge. Any effort to apply meanings as a matter of law simply results in the creation of endless distinctions or in a uniformity that is achieved by squeezing sets of facts into molds carefully tailored for other, but slightly different, sets of facts. The court in *Boedigheimer v. Taylor*, 287 Minn. 323, 178 N.W.2d 610 (1970), while apparently finding more precision in the words used here than I do, held that the problem was one of fact.