647 P.2d 754

Norman Kay MOSS, Plaintiff-Appellant,

v.

MID–AMERICAN FIRE AND MARINE INSURANCE COMPANY, Defendant-Respondent.

No. 13549.

Supreme Court of Idaho.

June 30, 1982.

Mark B. Clark, Pocatello, for plaintiff-appellant.

Gary T. Dance of Merrill & Merrill, Pocatello, for defendant-respondent.

SHEPARD, Justice.

This is an appeal from an order granting defendant's motion for summary judgment in an action to recover under an insurance policy. We reverse.

Plaintiff-appellant Norman Moss purchased an insurance policy from defendant-respondent Mid-American Fire and Marine Insurance Company on September 17, 1977. Moss was a farmer who also used his truck to haul grain and coal in southeastern Idaho and northeastern Utah. This policy with Mid-American was issued to cover this commercial hauling. It included a "radius en-

dorsement" which excused Mid-American from liability if Moss made "regular or frequent" business trips to locations more than 300 miles from his residence in Rockland, Idaho.

Moss, or his son, made 135 commercial hauling trips. Of these, thirteen were outside the 300 mile radius endorsement. On July 21, 1978, on the last of these thirteen trips, Moss was involved in an accident in Avondale, Arizona. The owners of the other vehicles involved in the accident filed suit against him. Mid-American then denied liability. Moss filed suit in the district court of Bannock County seeking a declaratory judgment that Mid-American's policy covered his accident and that the company was liable for the damages to his own truck. Mid-American answered and counterclaimed, also seeking declaratory relief. In August 1979, Moss moved for partial summary judgment; then three weeks later Mid-American filed a motion seeking summary judgment.

The trial court ruled that the terms "regular or frequent" were not ambiguous and concluded that Moss had made "regular *or* frequent" trips outside the radius endorsement. Accordingly, the court granted Mid-American's motion to summary judgment and denied Moss' motion.

On appeal appellant renews his argument that the terms "regular or frequent" are ambiguous. With this contention we agree. Hence, the order of summary judgment must be reversed.

■ This Court has long recognized that insurance policies are contracts of adhesion, not subject to negotiation between the parties, and hence must be construed most strongly against the insurer. *Abbie Uriguen Olds. Buick, Inc. v. United States Fire Ins. Co.*, 95 Idaho 501, 511 P.2d 783 (1973); *Stephens v. New Hampshire Ins. Co.*, 92 Idaho 537, 447 P.2d 14 (1968); *Scharbach v. Continental Cas. Co.*, 83 Idaho 589, 366 P.2d 826 (1961); *Rollefson v. Lutheran Brotherhood*, 64 Idaho 331, 132 P.2d 758 (1942). The provision at issue today is one which seeks to exclude the insurer's coverage. Such an exclusion must be strictly construed in favor of the insured. *Hahn v. Alaska Title Guaranty Co.*, 557 P.2d 143 (Alaska, 1976); *Mission Ins. Co. v. Nethers*, 119 Ariz. 405, 581 P.2d 250 (Ariz.App.1978); *State Farm Mutual Auto. Ins. Co. v. Partridge*, 10 Cal.3d 94, 109 Cal.Rptr. 811, 514 P.2d 123 (1973); *Northwestern Nat. Cas. Co. v. Phalen*, 597 P.2d 720 (Mont.1979); *Conner v. Transamerica Ins. Co.*, 496 P.2d 770 (Okl.1972); *McDonald Industries, Inc. v. Rollins Leasing Corp.*, 26 Wash.App. 376, 613 P.2d 800 (1980). *See also Bonner County v. Panhandle Rodeo Ass'n Inc.*, 101 Idaho 772, 620 P.2d 1102 (1980); *Farmers Ins. Group v. Sessions*, 100 Idaho 914, 607 P.2d 422 (1980). Hence, the courts have held that the burden is on the insurer to use clear and precise language if it wishes to restrict the scope of its coverage. *Goforth v. Franklin Life Ins. Co.*, 202 Kan. 413, 449 P.2d 477 (1969); *Anderson v. Nationwide Life Ins. Co.*, 6 Kan.App.2d 163, 627 P.2d 344 (1981); *Harvey's Wagon Wheel, Inc. v. MacSween*, 96 Nev. 215, 606 P.2d 1095 (1980). Here, Mid-American has not met its above-noted burdens of clarity and precision in its utilization of the terms "regular" or "frequent."

■ This Court has held that when a contractual provision is reasonably subject to differing interpretations, it is ambiguous and its meaning is a question of fact. *E.g., Rutter v. McLaughlin*, 101 Idaho 292, 612 P.2d 135 (1980); *Bergkamp v. Carrico*, 101 Idaho 365, 613 P.2d 376 (1980). *See Farmers Ins. Group v. Sessions*, 100 Idaho 914, 607 P.2d 422 (1980) (holding that an exclusionary clause in an insurance contract that lends itself to different interpretations is ambiguous and must be construed in a manner most favorably to the insured). The application of that rule to the instant case requires a holding that the terms "regular" or "frequent" are ambiguous. Indeed, the terms "regularly or frequently used" were held to be ambiguous in *Shadbolt v. Farmers Ins. Exchange*, 275 Or. 407, 551 P.2d 478 (1976). The Oregon court explained its reasoning in a later case:

"[W]hen words or terms of a general nature are used in an insurance policy

such words or terms may be ambiguous, in a legal sense, when they can reasonably be given a broader or narrower meaning, depending on the intent of the parties in the context in which such words are used by them."

*Allen v. Continental Ins. Co.,* 280 Or. 631, 572 P.2d 617, 617–18 (1977). *See also State Farm Mutual Auto Ins. Co. v. Gudmunson,* 495 F.Supp. 794 (D.Mont.1980). That Oregon rule is closely allied with the:

"long established precedent of this Court to view insurance contracts in favor of their general objectives rather than on a basis of strict technical interpretation of the language found therein. Where language may be given two meanings, one of which permits recovery and the other does not, it is to be given the construction most favorable to the insured. Stated somewhat differently, an insurance contract is to be construed most favorably to the insured and in such a manner as to provide full coverage for the indicated risks rather than to narrow protection. This Court will not sanction a construction of the insurer's language that will defeat the very purpose or object of the insurance."

*Bonner County v. Panhandle Rodeo Ass'n Inc.,* 101 Idaho 772, 776, 620 P.2d 1102, 1106 (1980), *quoting Erikson v. Nationwide Mutual Ins. Co.,* 97 Idaho 288, 292, 543 P.2d 841, 845 (1975). *Accord Stoddard v. "AID" Ins. Co. (Mutual),* 97 Idaho 508, 509, 547 P.2d 1113, 1114 (1976); *Shields v. Hiram C. Gardner, Inc.,* 92 Idaho 423, 444 P.2d 38 (1968); *Watkins v. Federal Life Ins. Co.,* 54 Idaho 174, 29 P.2d 1007 (1934). Indeed, this Court has observed that the policy's coverage ambiguity is perhaps demonstrated by the fact that this Court is almost equally divided upon the proper interpretation of the provision. *Shields v. Hiram C. Gardner, Inc., supra.*

█ Additional indication of vagueness and ambiguity of the two terms is found when the contract is examined as a whole. More than forty terms are defined in the contract. If the question was what constituted an "automobile" or a "bodily injury"

for example, an insured could have looked to the definitions contained in the contract. However, if an insured desired to know what constituted "regular" or "frequent" trips, he would be required to guess. The policy did not set a percentage of hauling time as deemed "frequent," nor did it state that a certain number of trips per month constituted "regular" use, nor in fact was there any attempt to give the insured advance notice and guidance regarding the meaning of those terms. By examining the policy Moss could not know that the thirteenth trip put him beyond the limit supposedly imposed by those terms.

It is true that other courts have held that the terms regular or frequent are not ambiguous. *E.g., Commercial Standard Insurance Co. v. Haley,* 282 F.Supp. 16, 20 (S.D. Iowa 1968). Nevertheless, even those courts treat the issue as a question of fact to be decided by the trier of fact. In *Boedigheimer v. Taylor,* 287 Minn. 323, 178 N.W.2d 610 (1970), the court required such a case to go to the jury with the instruction that the terms are to be given their common and ordinary meaning in order to determine the *factual* issue of whether there had been compliance with those terms. Likewise, the Iowa court held that the term "regular use" involved a determination of a question of fact. *General Casualty Co. of Wisconsin v. Hines,* 261 Iowa 738, 156 N.W.2d 118 (1968). In *Pennsylvania Casualty Co. v. McCoy,* 167 F.2d 132 (5th Cir. 1948), a trial court sat as the trier of fact. On appeal, the trial court's decision was characterized as having "found" that the use of the vehicle was not "regular" or "frequent" so as to exclude it from coverage under the policy. In *State Farm Mutual Auto. Ins. Co. v. Gudmunson,* 495 F.Supp. 794 (D.Mont.1980), the question was presented as to whether a jeep was available for "frequent use." The court held it was not, as a matter of fact, and in language pertinent to this case, stated:

"I think that the variants in the meaning of common words should be considered by the finder of fact—normally a jury. Words used in an insurance policy should be given the meaning which the commu-

nity would generally give them. A jury chosen from the community is probably better equipped to apply community meanings than is a judge. Any effort to apply meanings as a matter of law simply results in the creation of endless distinctions or in a uniformity that is achieved by squeezing sets of facts into molds carefully tailored for other, but slightly different, sets of facts."

*Id.* at 797 n.4. In *Emmco Ins. Co. v. Waters,* 413 S.W.2d 484 (Tex.Civ.App.1967), a jury verdict for the insured was upheld in the face of assertions by the insurer that eight trips outside the mileage limit in the nine-month policy period were "regular" and "frequent" as a matter of law. *See also Bandy v. East & West Ins. Co.,* 163 S.W.2d 350 (Mo.App.1942); *Bruins v. Anderson,* 73 S.D. 620, 47 N.W.2d 493 (1951). We have been cited to no case holding that the issue is one of law for the court to determine at the summary judgment stage.

■ Under the Idaho Rules of Civil Procedure, summary judgment is appropriate only when there is no genuine issue of material fact after the pleadings, depositions, admissions, and affidavits have been construed most favorably to the opposing party and the moving party is entitled to a judgment as a matter of law. I.R.C.P. 56(c); *Kline v. Clinton,* 103 Idaho 116, 645 P.2d 350 (1982); *Palmer v. Idaho Bank & Trust of Kooskia,* 100 Idaho 642, 603 P.2d 597 (1979). When terms of a contract are ambiguous, their interpretation presents a question of fact. *Pollard Oil Co. v. Christensen,* 103 Idaho 110, 645 P.2d 344 (1982); *Pocatello Industrial Park Co. v. Steel West, Inc.,* 101 Idaho 783, 621 P.2d 399 (1980); *Puchner v. Allatt,* 101 Idaho 37, 607 P.2d 1091 (1980) (per curiam). We hold that thirteen trips outside the 300 mile limit during the ten months that the policy was in effect do not entitle Mid-American to judgment as a matter of law. Reasonable minds could certainly differ on whether those facts constitute "regular or frequent" trips. *See Emmco Ins. Co. v. Waters, supra; Bandy v. East & West Ins. Co., supra; Bruins v. Anderson, supra.* Nor does the fact that both parties moved for summary judgment demonstrate that there is no material issue of fact. *Casey v. Highlands Ins. Co.,* 100 Idaho 505, 600 P.2d 1387 (1979); *Farmer's Ins. Co. of Idaho v. Brown,* 97 Idaho 380, 544 P.2d 1150 (1976). Our rules do not contemplate the transformation of the court, sitting to hear a summary judgment motion, into the trier of fact when cross motions for summary judgment have been filed. I.R.C.P. 56(c).

Consequently, we believe that there is a material issue of fact on the question of whether Moss made "regular or frequent" trips outside the radius endorsement that was inappropriate to resolve upon a motion for summary judgment.

■ Upon remand the court will again be faced with the proper factors to be applied in determining whether Moss' trips were "regular or frequent." Respondents argue that the regularity and frequency of Moss' trips must be measured from the date of his first commercial trip outside the 300 mile boundary in January 1978. We disagree. The policy became effective on September 13, 1977, and was to cover one year. A contract must be construed as a whole, rather than focusing on a particular isolated provision. *Canyon View Irrigation Co. v. Twin Falls Canal Co.,* 101 Idaho 604, 619 P.2d 122 (1980), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1983, 68 L.Ed.2d 301 (1981); *Beal v. Mars Larsen Ranch Corp., Inc.,* 99 Idaho 662, 586 P.2d 1378 (1978); *West v. Brenner,* 88 Idaho 44, 396 P.2d 115 (1964). Therefore, the full time period beginning in September must be considered. Indeed, the cases universally use the effective date of the insurance policy as a reference point to calculate the number of trips and the frequency and regularity thereof. *Commercial Standard Ins. Co. v. Haley,* 282 F.Supp. 16 (S.D.Iowa 1968); *Weaver v. National Fidelity Ins. Co.,* 377 S.W.2d 73 (Ky.1964); *Emmco Ins. Co. v. Waters,* 413 S.W.2d 484 (Tex.Civ.App.1967).

■ Additionally, we approve of the trial court's comparison of the total number of trips outside the mileage limit with the total number of trips. *Bruins v. Anderson,*

*supra; Emmco Ins. Co. v. Waters, supra.* The weekly or monthly trip average can also be used to determine frequency. *Commercial Standard Ins. Co. v. Haley, supra; Weaver v. National Fidelity Ins. Co., supra.* The issue of regularity focuses on "the idea of a fixed time of departure and return— the idea of a regular run or schedule." *Pennsylvania Casualty Co. v. McCoy*, 167 F.2d 132, 133 (5th Cir. 1948).

Construing all facts and inferences arising therefrom in favor of the party opposing summary judgment, as we are required to do, I.R.C.P. 56(c); *Twin Falls Clinic and Hospital Building Corp. v. Hamill*, 103 Idaho 19, 644 P.2d 341 (1982), we are unable to hold that Moss' relationship with Hyrum Feed and Grain establishes a continuing business relationship taking Moss on a regular run beyond the 300 mile limit. Construing the facts and depositions in Moss' favor, the record shows that he traveled to Arizona only when called by Hyrum Feed and Grain and only when it would not interfere with his regular schedule of hauling coal to his established customers. This is an insufficient basis upon which to grant a summary judgment holding that Moss made "regular" trips outside the mileage limit.

Hence, we reverse and remand for further proceedings consistent with this opinion. Costs to appellants.

DONALDSON, J., concurs.

BISTLINE, Justice, concurring only in reversal of the summary judgment and in the award of costs:

The reader of the Court's opinion and also that of the dissenters will surely conclude that Moss got considerably more than he bargained for when he transacted business with Mid-America. As is so with most responsible citizens, Moss sought coverage which would enable him to financially respond to any party whom or whose property might be injured in the operation of his hauling equipment. What he didn't bargain for, but received anyway, was what is now almost five years of expensive litigation—and more to come. Having a *truck* for which he desired coverage, he received

Mid-America's GENERAL AUTOMOBILE LIABILITY POLICY, which concededly gave him ostensible coverage by defining "automobile" as "a land motor vehicle, trailer, or semi trailer," and thus inclusive of Moss's 1974 Ford 10-wheel truck and its tagalong 74 Tesco trailer—specifically itemized in the policy as such. As the Court's opinion notes, the policy is replete with definitions. It also contains a multitude of conditions and various endorsements. One such endorsement is that which the Court's opinion refers to as a "radius endorsement," but which is actually in the policy called a "mileage limitation," and reads:

> "It is agreed that the insurance with respect to the automobile described above or designated in the policy as subject to this endorsement does not apply, if regular or frequent trips of the automobile exceed a 300 mile radius of the limits of the city or town where such automobile is principally garaged as stated in the policy, to any bodily injury or property damage which occurs during any such trip, or return therefrom, other than bodily injury or property damage which occurs during the use of such automobile for personal, pleasure or family purposes on a trip beyond such radius."

As the Court's opinion and the dissenters both agree, Moss was sold a policy which provided him with no definition of "frequent" or of "regular." One contention made at oral argument by Mid-America was that both words are of common usage and hence not in need of definition, yet we seem to now have three legal points of view as to what falls within "frequent" and what falls into "regular"—the trial court, this Court, and the dissent all fashioning different formulae as to how Moss's case is to be decided. I incline to join the Court's opinion because it does reverse the summary judgment turning down Moss's claim against his carrier, and is in that respect a well-written and precedentially substantiated analysis of the controversy. Nevertheless, I am persuaded that Moss should not be made to further undergo the rigors and expenses of further litigation. In short, I

am brought to the conviction that Mid-America, knowing his insurance needs, should not have sold him this particular policy without its containing a provision telling him exactly what was meant by "frequent" and what was meant by "regular," and also that the word "or"—which sometimes is judicially defined to mean "and"—in this case would be restricted to the disjunctive—as it apparently so is. Certainly not an absolute proposition by any means, but not an issue and accordingly removed from any considered discussion. (Anyone can see that one actually scheduled trip per year is "regular" enough to invoke argument that the mileage exclusion applies—but a regular one-trip affair is not "frequent." Or is it, compared to a scheduled trip every other year?)

So long as Mid-America was content to sell its policy without definition of these terms in language capable of understanding by the average lay person, it ought not be allowed to defend against a claim on the basis of its own inadequate contract.

Moss was specifically asked if he considered his thirteen trips as being "frequent" or "regular." His answer:

"Q. You heard Mr. Dance ask you from time to time two words that seem to be important here, regular or frequent?
A. Yes.
Q. Prior to 1977 had you ever made any trips to Arizona?
A. Made one trip in a car about three years ago, three or four years ago.
Q. Is this the first time you have ever been to Arizona?
A. Yes.
Q. So as far as the truck is concerned, had it ever made any trips prior to that time?
A. No, never dreamed about it until about a year ago.
Q. Well, so that even in 1977 did you make any trips to Arizona?
A. No.
Q. What's your contention with respect to whether or not these trips to Arizona were regular?
A. Well, I just couldn't consider them regular or frequent.
Q. Why? Let's talk about regular first.
A. Well, because we just went on a call basis whenever they had a need.
Q. And when, what, it didn't interfere with your coal?
A. Coal haul, yes.
Q. You have a regular route of coal customers, do you not?
A. Yes.
Q. And so basically this is your winter's job; isn't it?
A. Yes.
Q. And you use the coal hauling to subsidize your farming income?
A. Yes.
Q. How many children do you have?
A. Ten.
Q. Now, speaking of regular, then, it would only be when they called and when you didn't have a coal haul?
A. Right.
Q. Now, the other term, frequent, other than these trips down there, what did you do in the interim periods?
A. Either hauled coal or grain.
Q. So that basically as considering the frequency of these trips as opposed to your other trips, what would you say would be the bulk of your trips, numbers of trips?
A. Oh, coal and grain.
Q. By a wide margin?
A. Yes."

As given prominence in the dissent, it is true that Moss himself, obviously wanting some reassurance on his belief that he would not be transgressing a reasonable view of "frequent" or "regular" did testify that he asked the local agent's opinion and was told that if he called in it would be all right. That he did do so the first time and that he didn't feel obligated to call in subsequently proves nothing other than that it corroborated Moss's testimony as to what he thought. And, a proposition I think of extreme importance is that nothing in this record shows that Mid-America has ever ratified, or would ratify, a local agent's

opinion as to the applicability and interpretation of this or any other endorsement to the policy. Experience teaches otherwise. Be that as it may, 'tis a strange way of doing business where the owner of a policy is obliged to continually, or at all, seek his carrier's *oral* advice as to whether his trips will be considered "frequent" or "regular."

Just a year ago in *Foremost Insurance Co. v. Putzier*, 102 Idaho 138, 627 P.2d 317 (1981), the Court refined, reaffirmed, and relied on the language of Justice Donaldson's opinion in *Corgatelli v. Globe Life & Accident Co.*, 96 Idaho 616, 533 P.2d 737 (1975):

> " '[t]he *doctrine of probability or reasonableness has long been a rule of construction geared toward ascertaining intent in situations of ambiguity. The standard to be applied is what a reasonable person* in the position of the insured *would have understood* the language to mean.' 96 Idaho at 622, 533 P.2d at 743. (Donaldson, J., dissenting.) (Emphasis added.)

Under this rule of construction, which utilizes an objective standard and which is used in the case of ambiguously written insurance policies, to effectuate the intent of the parties, the test is what a reasonable person in the position of the insured would have understood the language of the contract to mean. This test is not necessarily conclusive as to the intent of the parties, but is only one rule of construction to be considered in construing an ambiguous contract. This standard is, of course, in accord with the general rule of construing insurance contracts against those who write them." 102 Idaho at 142, 627 P.2d at 32. (Footnotes omitted.)

With a record which fails to demonstrate either contention or proof that Moss is not a reasonable person, that statement in *Foremost* is controlling, should be applied, and likely would have been applied by the trial court other than for the fact that the opinion in *Foremost* had not been announced when the trial court had before it the cross-motions for summary judgment in this case. Other pertinent language in *Foremost*, although not of equal significance, militates in favor of finding merit in Moss's arguments.

The dissenting opinion suggests that to adopt any view inconsistent with that therein expressed paves the way for conniving farmers to deceptively obtain cheap insurance. I see no merit in such argument, and even were it true in some other case, Mid-America can close the door to any such practices by providing its policyholders with policies couched in unambiguous language. In connection with that concern, in district court proceedings, Mid-America filed an affidavit showing that Moss for $1,500 more premium could have been sold a policy from which was removed all doubt and ambiguity. The suggestion, one supposes, is that this farmer, father of ten, was bent on outslickering an insurance company. The message better received, however, is from the fact that no contention is made that he was ever offered such a policy other than the one he was sold, but should not have been.

While, as I say, I am inclined to join the Court's opinion, full justice is not being done, and by not joining, the trial court on remand will in its further disposition of the case not be fettered by a majority opinion which predetermines its approach to a final resolution. The trial court is not precluded from reconsideration of Moss's motion for summary judgment.

For the foregoing reasons I concur with the Court's opinion insofar as it reverses the summary judgment granted Mid-America. I concur in awarding costs to Moss, which will also include attorney fees for the appeal should Moss eventually prevail in further proceedings in the trial court, which court can include attorney fees on the appeal as part of Moss's recoverable expenses in pursuing his claim.

McFADDEN, Justice, dissenting.

I am unable to agree with the opinion of the majority and therefore I must dissent.

The majority reverses the trial court's grant of motion for summary judgment on

the basis that the terms "regular or frequent" are ambiguous. Appellant was unable to cite any cases so holding and the trial court was unable to find any. However, the majority manages to find *one* case interpreting the terms "regularly" or "frequently" as ambiguous. I do not agree that the terms are subject to differing definitions. As the court in *Commercial Standard Ins. Co. v. Haley*, 282 F.Supp. 16, 20 (S.D.Iowa 1968), stated:

> "The Court does not feel that there is any room for judicial emasculation of the terms 'regular' or 'frequent.' The ordinary man would have no difficulty in interpreting words of such common usage. 'Regular,' as used in the context of the policy in question, connotes a uniform or recurring course of action or conduct. The term 'frequent' usually portrays the concept of ' "Often to be met with, happening at short intervals, often repeated or recurring, 'as frequent visits.' " ' *Weaver v. National Fidelity Ins. Co.*, 377 S.W.2d 73, 75 (Ky.). Any ambiguities which could be said to be generated by the use of those terms in the policy derive from the fact that their inherent nature necessitates a factual consideration in each case to determine whether the use was 'regular' or 'frequent.' Ambiguities in that sense have apparently led some authorities to approach the *factual application* of the terms to the manner and extent of use of a commercial vehicle in a liberal spirit. See, e.g., *Weaver*, supra; *Indiana Rolling Mill Bailing Corp. v. National Automobile and Cas. Ins. Co.*, 141 F.Supp. 831 (D.Ind.), aff'd. 240 F.2d 74 (7 Cir.); *Bruins v. Anderson*, 73 S.D. 620, 47 N.W.2d 493. But no court has found that the terms themselves need clarification."

The majority states that even those courts which have held that the terms are not ambiguous have treated the issue as a question of fact for the trier of fact. While this may be correct in another factual setting, it is inapplicable here by reason of the fact that both parties filed motions for summary judgment. The effect of cross motions for summary judgment was raised at oral argument and subsequently briefed by counsel.

Other than the statement "[n]or does the fact that both parties moved for summary judgment demonstrate that there is no material issue of fact," the majority ignores this issue. Mr. Moss, like Mid-America, felt that the issue was one of law. The facts are undisputed. Indeed, even in his briefs on appeal Moss asserts that summary judgment should have been granted in his favor. It was not until oral argument with prompting from the court that counsel noted that there might be a factual issue involved. It was only when he lost on the law that he asserted there were factual issues. Undoubtedly, if Mr. Moss had prevailed on his theory, he would still be contending that the issue was one of law not of fact. As the Supreme Court of Utah so succinctly stated in *Mastic Tile Division of the Ruberoid Co. v. Acme Distributing Co.*, 15 Utah 2d 136, 389 P.2d 56, 57 (1964):

> "Both sides laid the matter in the lap of the court by their mutual motions, and under the facts of this particular case unequivocally invited and authorized the court to decide the case by interpreting the documents. This the court did. Having done so in a case like this, where interpretation of the writings was the only issue, we do not think the court should be required to submit to the subsequent urging of the loser that although he took his chances without reservation, he must have another go at the case,—although it is conceivable that in some other and unusual case this might be so."

There are many cases throughout the country discussing the effect of cross motions for summary judgment. One line of cases state the general rule that the fact that both parties move for summary judgment does not in itself establish that there is no genuine issue of fact. *Casey v. Highlands Ins. Co.*, 100 Idaho 505, 600 P.2d 1387 (1979); *Farmers Ins. v. Brown*, 97 Idaho 380, 544 P.2d 1150 (1976); *Eagle v. Louisiana and Southern Life Ins. Co.*, 464 F.2d 607 (10th Cir. 1972); *McCown v. Humble Oil and Refining Co.*, 405 F.2d 596 (4th Cir. 1969). Another line of cases indicate that when both parties allege that there is no

genuine issue as to any material fact they are then precluded from changing their position on appeal. *State Welfare Div. v. Capital Convalescent Center, Inc.*, 92 Nev. 147, 547 P.2d 677 (1976); *Wycoff Co. v. Public Service Comm'n*, 15 Utah 2d 139, 389 P.2d 57 (1964) (where only the interpretation of the writings was in issue); *McBean v. McBean*, 371 S.W.2d 930 (Ct.Civ.App.Tex. 1963) (where both parties assert that there is no triable issue of fact the matter in controversy becomes one for the court to decide as a matter of law); *Dell Publishing Co. v. Summerfield*, 198 F.Supp. 843 (D.D.C. 1961) (by making cross motions the parties concede that the matter should be determined as a question of law). *See also Goodman v. Strassburg*, 139 So.2d 163 (Fla.App. 1962); *Garrett Freightlines, Inc. v. United States*, 236 F.Supp. 594 (D.Idaho 1964).

I cannot say that in all cases cross motions for summary judgment will preclude the parties from later asserting that there is a triable issue of fact. This is so because by the filing of a motion a party concedes that no issue of fact exists under the theory he is advancing, but does not thereby concede that no issues remain in the event his adversary's theory is adopted. *Nafco Oil and Gas, Inc. v. Appleman*, 380 F.2d 323 (10th Cir. 1967). The Fifth Circuit elaborated on this point in *Schlytter v. Baker*, 580 F.2d 848, 849 (5th Cir. 1978), in language that in my opinion reflects the current rule. There the court stated:

> "As a general rule the filing by both parties of opposing motions for summary judgment will not warrant a court's granting either party's motion if, indeed, there exists a genuine factual dispute concerning a material issue. As explained in *Stuart Plastering [Bricklayers etc. v. Stuart Plastering Co.]* (512 F.2d 1017, 5th Cir. 1975) the rationale of this rule lies in the fact that each party may be basing its motion on a different legal theory dependent on a different set of material facts.
>
> When the parties proceed on the same legal theory and on the same material facts, however, the basis for the rule disappears. Thus, in qualifying the general

rule, this Court has said: Nonetheless, cross motions may be probative of the non-existence of a factual dispute when, as here, they demonstrate a basic agreement concerning what legal theories and material facts are dispositive." (Citations omitted.)

A two-fold test emerges. Are the parties proceeding on the same legal theory and are they relying on the same set of material facts? This is precisely the situation involved here. Both parties in their motions assert that there is no genuine issue as to any material fact. Plaintiff-appellant asserts that the depositions and affidavits show that the trips were not violative of the radius endorsement. Defendant-respondent asserts, based on the same facts, that the trips were violative. Therefore, the parties having based their summary judgment motions on the same legal theory, the case was properly presented for decision by summary judgment.

Because the terms are unambiguous they will be construed in their ordinary meaning. This court stated in *Thomas v. Farm Bureau Mut. Ins. Co. of Idaho, Inc.*, 82 Idaho 314, 318, 353 P.2d 776, 778 (1960), quoting with approval, *Miller v. World Ins. Co.*, 76 Idaho 355, 357, 283 P.2d 581, 582 (1955):

> "Policies of insurance, as other contracts, are to be construed in their ordinary meaning and where the language employed is clear and unambiguous, there is no occasion to construe a policy other than the meaning as determined from the plain wording therein. It is the function of the Court to construe a contract of insurance as it is written, and the Court by construction cannot create a liability not assumed by the insurer nor make a new contract for the parties, or one different from that plainly intended, nor add words to the contract of insurance to either create or avoid liability." (Citations omitted.)

Based upon their ordinary meaning in interpreting the terms, "regular" or "frequent," as used in this insurance policy, it is to be noted that the policy provided the exclusion would apply if Mr. Moss's trips were regu-

lar *or* frequent. Therefore, with this case being submitted for decision to the trial court by each of the parties relying on the same set of facts and on the same legal theory, if the trial court could reasonably have found either of the above, that decision should be affirmed.

Each party urged upon the trial court a different method of determining what constitutes regular or frequent. The insured, appellant, urged that the court should compare the total trips made during the policy period with those outside the mileage radius; and the insurer, respondent Mid-America, urged that the court should analyze the time spent on the excess trips in relation to the total hauling time available to appellant. The trial court rejected both approaches as incomplete and adopted a combination of factors in making its determination. These factors were the number of trips outside the limit, the number of miles travelled on those trips, the time devoted to each trip, the interval between each trip and a comparison of the outside trips with the total number of trips made. This is a case of first impression in Idaho as far as what factors are to be used in applying the terms, regular or frequent.

The court of appeals for the fifth circuit in *Pennsylvania Casualty Co. v. McCoy*, 167 F.2d 132, 133 (5th Cir. 1948), elaborated some factors which it deemed helpful in the analysis of the facts.

" 'The term "regular" and the term "frequent" is each a relative term, depending upon the facts and circumstances. For instance, a fast-moving, lightly-loaded automobile is capable of making more frequent trips than a slow-moving, heavily-laden one, and what would be frequent trips for the latter might not be considered so frequent for the former vehicle. The distances of the trips would also enter into the question of frequency. Regularity might encompass the idea of a fixed time of departure and return—the idea of a regular run or schedule.' "

The court in *Commercial Standard Ins. Co. v. Haley*, 282 F.Supp. 16 (S.D.Iowa 1968), also took into account the intervals between trips, compared total trips to trips outside the radius and considered the distance and amount of time expended upon trips past the radius borders.

Appellant made thirteen trips outside the mileage limitation between January 1978, the date of the first trip, and July 1978, the date of the accident. Each trip took approximately three or four days and covered 1600 miles round trip. The trips were January 24, March 2, March 10, April 5, April 13, April 25, May 15, May 25, June 9, June 23, July 5, July 12, and July 21, approximately two trips per calendar month. Between January and July Mr. Moss had approximately 153 days hauling time. He made thirteen trips of four days each, which means he spent approximately 34% of his time hauling outside the mileage limitation. Over the last thirty days of that period, June 21 to July 23, he made four trips to Arizona, consuming a total of sixteen days which represents nearly 62% of his available hauling time during that time. The intervals between trips, as determined by subtracting from the number of days between trips, four days for the trips, were thirty-five, four, twenty-one, three, six, fourteen, five, eleven, nine, nine, three and five. Applying the definition of the term "frequent" as often repeated or occurring, appellant's trips were "frequent." The Kentucky case, *Weaver v. National Fidelity Ins. Co.*, 377 S.W.2d 73 (Ky.1964), dealt with a 150 mile radius provision. In that case the insured made a total of 105 trips, 23 of which were beyond the mileage limitation. That court based its decision on the meaning of the term "frequent" and stated that "although the trucks were only used 22% of the time between the issuance of the policy and the date of the accident on trips over the 150 mile limit, the frequency of the trips was increasing with each month and in the month during which the accident occurred amounted to almost 42% of the total period." Appellant's trips were likewise increasing in frequency at the time of the accident. He was making two trips per month on the average and had made four in the thirty days preceding the accident, consuming approximately sixteen days. In its

order the trial court stated that "both parties are seeking a factual determination as to whether the mileage limitation was violated." After applying the factors discussed above, the court concluded that

"[b]ecause of the significant excessive mileage, the time consumed making the trips and the continuing business relationship taking him beyond the limitation, it appears to this Court that plaintiff did make 'regular or frequent' trips beyond the mileage limitation. However, even though plaintiff breached the conditions in the endorsement, it must be shown that the breach contributed to the loss or, in fact, made the risk more hazardous. The affidavit of Mr. Mordhorst points out that the coverage for the trips to Arizona would increase the premium because of the increased risk involved. He also pointed out that Arizona and California were each risk zones in which defendant would not insure. It is apparent that traveling almost three times beyond the mileage limitation twice a month did, in fact, increase the risk of loss for the defendant and consequently, the breach by plaintiff does result in an increased burden upon the defendant, a burden the defendant did not contractually accept."

The trips of Moss were sufficient to constitute "frequent" in the eyes of the trial court. Even if others might have viewed these facts differently still it was for the trial court to resolve such conflict, which it did. The use by the trial court of the factors discussed are consistent with the factors used by the courts of other jurisdictions and I cannot say as a matter of law that the trial court erred in this regard.

In setting forth the factors to be used by the trial court to determine "frequency," the majority states that the full time period from September must be used and fails to include the time consumed in making the trips as a factor. I disagree with both of these conclusions.

It is conceivable if not probable that the insured could avoid the mile limitation simply by planning his out of the limitation trips for the end of the policy period. An insured could spend the last months of the policy period making trips beyond the limitation as long as he made enough trips in the previous months so that in comparing the two figures the trips within the limitation were more numerous. Therefore, the result is that although an insured spends the majority of his time outside the limitation in the last months his trips cannot be characterized as "frequent."

The other way the insured can avoid the exclusion is simply by making extended trips outside the radius. For example, the insured could take a one month, two month, or even six month trip outside the radius and still not be characterized as "frequent" so long as he made a sufficient number of trips within the limitation even if those trips are only three blocks. The majority ignores the fact that it takes a longer period of time to travel beyond 300 miles than it takes to travel within 300 miles. These results were not within the expectations of the parties when they contracted and yet under the majority's reasoning are probable. Mr. Moss contracted for the mileage limitation and accepted the benefits of a lower premium, violated that provision and still seeks coverage. Any insured could do the same just by planning ahead.

In discussing the ambiguity of the contract terms the majority states: "By examining the policy Moss could not know that the thirteenth trip put him beyond the limit supposedly imposed by those terms." In his deposition Moss testified that he was aware of the radius endorsement and that he asked the insurance agent what would happen if he had occasion to make a trip beyond the limitation and the insurance agent said if Moss called in he was sure it would be all right. Moss further testified that he did call in the first time but never checked in again. The obvious answer to the majority's concern that Moss would not know when he was in violation of the provision is that he could call the insurance company just like he did the first time.

The parties contracted for insurance coverage within certain mileage limitations.

Mr. Moss violated that provision but still feels that he should be covered. The opinion of the majority erodes the validity and enforceability of contracts in its desire to protect the little guy.

For the reasons set forth above I would affirm the judgment of the trial court.

BAKES, C. J., concurs.